UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

"IN ADMIRALTY"

Case No. 1:21-cv-24099-PCH

RONALD CONWAY, an individual,

    Plaintiff,

vs.

M/Y UTOPIA IV, Official No. 1305829,
MMSI No. 339328000, her engines, tackle,
gear, appurtenances, etc., *in rem*,

    Defendant.

_____/

## MOTION FOR ORDER TO SHOW CAUSE WHY ARREST SHOULD NOT BE VACATED AND REQUEST FOR HEARING

Owner, Utopia Yachting LLC ("Utopia"), on behalf of Defendant M/Y UTOPIA IV, Official No. 1305829, MMSI No. 339328000, her engines, tackle, gear, appurtenances, etc. ("Vessel"), by and through its undersigned counsel, and pursuant to Supplemental Admiralty Rule E(4)(f) and Local Admiralty Rule C(7), hereby files its Motion for Order to Show Cause Why Arrest Should Not be Vacated and Request for Hearing,[1] and in support thereof states:

### I.    Introduction

On the Tuesday before Thanksgiving, Plaintiff Ron Conway ("Plaintiff"), a hedge fund billionaire from San Francisco, filed an Emergency Motion asking this Court to issue an Arrest Warrant for the Utopia IV, a US-flagged vessel registered to an address in Miami, where it is routinely and regularly docked. On Plaintiff's word, the Court dispatched the United States Marshals to the Vessel owners' home to seize the Vessel. This blindsided the owners, who were known to Plaintiff

---

[1]     The Vessel and its owners also observe that a valid arbitration agreement covers Plaintiff Conway's claims. Plaintiffs intend to move to enforce this arbitration agreement.

and had been in communication with Conway about his claims.[2] Further, the Vessel was scheduled to put to sea the following day for a voyage over the Thanksgiving holiday. To avoid disrupting these plans, and after motioning the Court, the Vessel's owners posted a $3 million cash bond to obtain the Vessel's release.

When posting the bond, the owners' concerns were to keep the vessel from being seized as quickly and as surely as possible. They did not contest the merits of the arrest warrant—nor could they. Such proceedings are *ex parte*, and the Court relies on the honesty and good faith of the requesting party to ensure that the Court's arrest powers are not abused. However, Supplemental Admiralty Rule E(4)(f) provides vessel owners with a remedy on the back end. Pursuant to that Rule, "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." The Vessel's owners avail themselves of this procedure now.

Flatly, this arrest warrant should never have been issued. Plaintiff Conway based his motion for the arrest warrant on a purported maritime tort lien created by an August 11 injury that he suffered stepping from the Vessel's tender to a dock in Edgartown, Massachusetts. [DE 1 at ¶24.] Plaintiff Conway alleges that the step from the tender to the dock was too high, and someone should have told him to use a step stool. [*Id.* at ¶25.] For this failure, Plaintiff now claims damages "in excess of $3 million" [*Id.* at ¶9] and seeks to have the Vessel seized and sold at a U.S. Marshal's sale [*Id.* at 7–8].

Essential to Plaintiff Conway's claim is that the Vessel's owners remained in control of the Vessel throughout Plaintiff's trip. [*E.g.,* DE 1 at ¶¶19–20.] But this is not true. As Plaintiff well knows,

---

[2] Though the Vessel's owners are skeptical of the merits of Plaintiff's claims, the owners never gave Plaintiff cause to believe that they would seek to evade a lawful judgment or award.

2

he entered into a "bareboat" charter for the Vessel. Movants attach a copy of this bareboat charter hereto as **Exhibit "A."** Bareboat charters are common in the maritime industry. Through them, the charterer (here, Plaintiff) becomes the "owner *pro hac vice*" of the vessel through the charter period. Because of this, Plaintiff is not entitled to a maritime tort lien on the Vessel. As owner *pro hac vice* at the time of his injury, he is solely responsible for the negligent acts and omissions of which he complains. A Vessel owner's duties end upon provision of a seaworthy vessel. A bareboat charterer like Plaintiff may not, as a matter of law, assert a maritime tort lien against a vessel under these circumstances.

Plaintiff Conway appears to have avoided this rule by misleading the Court. Although Plaintiff Conway referenced the parties' "Recreational Bareboat Charter Agreement" [DE 1 at ¶13], Plaintiff Conway declined to attach the document to his Verified Complaint. Instead, Plaintiff Conway severely misconstrued the document's terms. As the Court will see, the plain and unambiguous language of the bareboat charter contradicts and negates a number of critical allegations in the Verified Complaint. If the Court had possession of the bareboat charter at the time it was presented with the *in rem* Verified Complaint—or if Plaintiff had honestly and accurately characterized its terms—Plaintiff would not have been able to establish that probable cause existed for the arrest.

By asking the Court to arrest the Vessel, Plaintiff Conway invoked the most visceral of the Court's powers. At the Court's direction, agents of the federal government forced[3] themselves into the Vessel's owners' home and took the owners' property. Consistent with the Supplemental Admiralty Rules—themselves a product of the Court's and Congress's considered judgment—this was done without any prior notice or hearing from the Vessel's owners.

---

[3] To be clear, the owners complied completely with the Court's warrant and the affair was handled in a civil and gentlemanly manner by both the owners and the Marshal's Office. But that should not obscure the fact that compliance with a warrant is not optional. The execution of a warrant is a forceful—though lawful—intrusion into the Vessel's owners' home.

But to ensure this process is not abused, the law requires strict honesty from the Plaintiff. And Plaintiff was not honest here. Accordingly, this Court should immediately vacate the arrest of the Vessel, enter an order returning the bond posted, and award the Vessel and its owners the fees and costs they incurred under these circumstances. The Vessel and its owners specifically reserve the right to subsequently file any motion, answer, or counterclaim seeking to recover monetary damages from Plaintiff for wrongful arrest or otherwise at the appropriate time permitted under the Supplemental and Local Admiralty Rules.

**II.     Background and Relevant Facts**

1. Plaintiff and Utopia entered into a "Recreational Bareboat Charter Agreement" for Plaintiff to charter M/Y Utopia IV for the Charter Period from August 8, 2021 to August 18, 2021, for a fee of $582,144.00. *See* Bareboat Charter, **Ex. "A."**

2. Plaintiff and Utopia both executed the Bareboat Charter thereby acknowledging its terms and conditions, which expressly include Clauses 1-30 and any additional conditions or attached addenda. *Id.*

3. Clause 6 of the Bareboat Charter sets forth Plaintiff's (as the Charterer) Authority and Responsibilities and states:

> A. This Agreement constitutes a demise charter of the Vessel to the CHARTERER under the maritime law of the United States. Therefore, the OWNER shall deliver and, during the Charter Period, the CHARTERER shall accept, **full possession, command, and navigation of the Vessel**. In addition, **the CHARTERER shall furnish its own crew and pay expenses and operating costs as provided in Clause 8.**
>
> B. If the CHARTERER chooses to utilize the services of a captain, the CHARTERER represents and warrants that such captain will be qualified and, if necessary, licensed, **provided that the CHARTERER shall remain responsible for the operation and management of the Vessel.**

*Id.* At 2 (emphasis added).

4. Clause 8 of the Bareboat Charter governs Expenses and Operating Costs and states:

4

> The **CHARTERER shall be responsible for the operating costs**, including, without limitation, all fuel costs for the Vessel, its tenders, and all watersports equipment; berthing dues and harbor charges, including customs formalities and Harbor, pilot, and divers' fees.  Charges for water and electricity taken from shore and any charges for waste disposal; ships' agents' fees, where applicable; national and local taxes, as applicable; food, beverages, personal laundry, and communications costs; hire or purchase costs of any special equipment placed on board at the CHARTERER's request; and any Additional Payments or any other payments as provided in Clause 30, **for the entire Charter Period, for the CHARTERER, the CHARTERER's guests, and any captain and crew retained by the CHARTERER.**

*Id.* At 3 (emphasis added).

5. Clause 13 of the Bareboat Charter governs Use of the Vessel.  Specifically, Clause 13 subsection C(2) details Compliance With Laws and states that:

> The **CHARTERER shall pay** any fines, penalties, **damages,** and forfeitures incurred **as a result of any negligent** or intentionally wrongful acts(s) of the **CHARTERER** or the CHARTERER's guests or invitees, **and the CHARTERER shall indemnify and hold the OWNER**, the Escrow Agent, and the broker **harmless against and from any claim arising out of or in connection with such negligence** of intentional acts.

*Id.* At 4-5 (emphasis added).

6. Clause 16 of the Bareboat Charter governs Insurance and states in relevant part:

> **E. The CHARTERER acknowledges that the CHARTERER is responsible for insuring** the CHARTERER's personal effects on board the Vessel and ashore, **and for insuring against any cost or expense incurred as a result of any accident or emergency during the Charter, including, without limitation, emergency medical evacuation or other emergency transport for the CHARTERER or the CHARTERER's guests, to the extent the same are not covered by the OWNER'S insurance policy.**
>
> **F. The CHARTERER acknowledges that neither cancellation and curtailment insurance, nor CHARTERER's liability insurance, as such, is included in this agreement.**

*Id.* At 5-6 (emphasis added).

7. Clause 27 of the Bareboat Charter governs Indemnification and states the following:

5

> **The CHARTERER shall indemnify, defend, and hold the OWNER harmless against and from any liability for loss, damage, or expenses incurred by the CHARTERER** or the CHARTERER's guests as a result of **the negligence** or willful act **of the CHARTERER** or the CHARTERER's guests, **to the extent such loss, damage, or expense is not covered by the OWNER'S insurance policy.**

*Id.* At 5-6 (emphasis added).

    8.    Clause 29 of the Bareboat Charter governs Maritime Liens and states the following:

> **The CHARTERER shall not incur or allow any maritime lien**, salvage, or debt **on the Vessel** or on the OWNER'S credit. The CHARTERER shall not abandon the Vessel or enter into any salvage agreement without the OWNER'S prior written consent. **The CHARTERER shall indemnify and hold the OWNER harmless against and from any liability for any maritime lien,** salvage, or debt **that arises on the Vessel** or the OWNER'S credit **as a result of any act or omission of the CHARTERER**.

*Id.* At 9 (emphasis added).

    9.    Clause 30 of the Bareboat Charter provides for Additional Conditions and states, in relevant part:

> The charterer has been given the option to choose the crew and has chosen ALM Yacht Management d.o.o.
>
> The charterer has been given the option to survey the vessel and has declined.

*Id.*

    10.    Plaintiff also entered into a separate Vessel Services Agreement ("Services Agreement") with ALM Yacht Management d.o.o. for the period from August 8, 2021 to August 18, 2021, for a fee of $360,715.00. *See* Services Agreement, attached hereto as **Exhibit "B."** This agreement governed Plaintiff's retention and compensation of a captain and crew during the subject bareboat charter. Utopia was not a party to the Services Agreement. *See id.*

    11.    Plaintiff allegedly suffered an injury while disembarking the Vessel's tender on August 11, 2021. *See generally* Complaint, DE 1.

6

12.     On November 22, 2021, Plaintiff filed his Verified *In Rem* Complaint to Enforce Plaintiff's Preferred Maritime Lien.  *Id.*  The Complaint did not provide the Court with a copy of the subject Bareboat Charter – the operative agreement between the parties.

13.      On the same day, Plaintiff filed an Emergency Motion Directing the Clerk to Issue a Warrant of Arrest *In Rem* [DE 3][4], which asserted in conclusory fashion that emergency circumstances existed requiring the clerk to immediately issue the subject warrant because the "Vessel could leave Miami at any time and not return indefinitely." This notwithstanding that Plaintiff also alleges in the same paragraph that the "Vessel regularly travels along the Atlantic Coast of the United States from Maine to Miami" and that one of the Vessel's ports of registry is here in Miami. *See* DE 3, ¶3.

14.     The Court entered an Order directing issuance of the warrant *in rem* against the vessel on November 22, 2022, and the Clerk issued the warrant. *See* DEs 6 and 7.

15.     On November 23, 2021, the warrant was executed and the vessel arrested. *See* DE 18.

16.     On the same day, and pursuant to Supplemental Rule E(5), Plaintiff and counsel for the vessel entered into a stipulation for the posting of a $3,000,000 bond in exchange for the release of the vessel. *See* DE 15.

17.     The Court entered an order directing the release of the vessel [DE 17], which was acknowledged by the U.S. Marshals on the same day. *See* DE 19.

18.     Utopia asserts that the Court would not have issued the warrant for arrest *in rem* of the vessel had Plaintiff provided the Bareboat Charter to the Court with its Complaint; there was no emergent circumstance requiring immediate arrest of the vessel; and, Plaintiff's actions in arresting the

---

[4] Supplemental Rule C(3)(a)(ii) states:

> (ii) If the plaintiff or the plaintiff's attorney certifies that exigent circumstances make court review impracticable, the clerk must promptly issue a summons and a warrant for the arrest of the vessel or other property that is the subject of the action. The plaintiff has the burden in any post-arrest hearing under Rule E(4)(f) to show that exigent circumstances existed.

vessel do not comport with the purpose, intent, and spirit of Supplemental Rule C as interpreted by general maritime law. Utopia requests the warrant be vacated forthwith.

### III. Memorandum of Law

#### A. Standard of Review

Supplemental Admiralty Rule E(4)(F) provides, in relevant part:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show cause why the arrest or attachment should not be vacated or other relief granted consistent with these rules. …

The Advisory Committee Notes for the Rule state:

> Rule E(4)(f) makes available the type of prompt post-seizure hearing in proceedings under Supplemental Rules B and C that the Supreme Court has called for in a number of cases arising in other contexts. *See North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600 (1974). Although post-attachment and post-arrest hearings always have been available on motion, an explicit statement emphasizing promptness and elaborating the procedure has been lacking in the Supplemental Rules. Rule E(4)(f) is designed to satisfy the constitutional requirement of due process by guaranteeing to the shipowner [sic] a prompt post-seizure hearing at which he can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings. The amendment also is intended to eliminate the previously disparate treatment under local rules of defendants whose property has been seized pursuant to Supplemental Rules B and C.

*See* Notes of Advisory Committee on Rules—1985 Amendment.

Pursuant Supplemental Rule E(4)(f), Plaintiff, as the arresting party "**must** present sufficient evidence to show that there were 'reasonable grounds' for attachment and that the arrest is supported by 'probable cause.'" *Casillo Commodities Italia S.P.A. v. M/V Long Cheer*, 2017 U.S. Dist. LEXIS 100012, at *4 (E.D. La. June 28, 2017) (internal citations omitted). Plaintiff has the burden of proof to show why the arrest should not be vacated. *Id.* To carry its burden, Plaintiff "must present sufficient evidence to show probable cause for the arrest," otherwise, "the arrest or attachment **must**

be vacated." *Id., citing Richardson Stevedoring & Logistics Services, Inc. v. Daebo Int'l Shipping Co. Ltd.*, 2015 WL 1781712 (E.D. La. Apr. 20, 2015) (emphasis added).

A Rule E(4)(f) hearing is not intended to definitively resolve the dispute between the parties, but only to make a preliminary determination of whether there are reasonable grounds for issuance of the arrest warrant, and if so to fix an appropriate bond. *North of England Protecting and Indem. Assoc., Ltd. V. M/V Nara*, 1999 U.S. Dist. LEXIS 22375, 1999 WL 33116416 (E.D. La. 1999).

Further, Local Admiralty Rule C(7) provides as follows:

> (7) Post-arrest Proceedings. Coincident with the filing of a claim pursuant to Supplemental Rule E(4)(f), and Local Admiralty Rule C(6)(a), the claimant may also file and serve a motion and proposed order directing plaintiff to show cause why the arrest should not be vacated. If the Court grants the order, the Court shall set a date and time for a show cause hearing. Thereafter, if the Court orders the arrest to be vacated, the Court shall award attorney's fees, costs, and other expenses incurred by any party as a result of the arrest.

### B. Legal Argument

#### *i.* ***The Parties entered into a bareboat charter agreement.***

As set forth in the subject bareboat charter, Utopia transferred "full possession, command, and navigation" of the vessel to Plaintiff. *See* Facts, ¶ 3. The bareboat charter also provided that Plaintiff as charterer "shall furnish its own crew and pay expenses and operating costs" and that notwithstanding Plaintiff's employment of a captain, Plaintiff, as charterer "shall remain responsible for the operation and management of the Vessel." *Id.* Plaintiff was given the option to select its captain and crew and did so, selecting ALM Yacht Management d.o.o., as stated in the Bareboat Charter. *Id.* at ¶ 9. Plaintiff entered into a separate Services Agreement for payment of the captain, crew, and for provisions. *Id.* at ¶ 10. Utopia was not a party to the Services Agreement. *Id.* The plain wording of the agreement demonstrates that it is a bareboat charter under general maritime law.

In a "bareboat" or "demise" charter, the owner makes complete transfer of possession, command and navigation of the vessel to the charterer. *Morris v Paradise of Port Richey, Inc.,* 2009 U.S. Dist. LEXIS 2392, 2009 WL 103291 (M.D. Fla. 2009), citing *Agrico Chemical v M/V Ben W. Martin*, 664 F.2d 85, 91 (5th Cir. 1979). "A demise is tantamount to, though just short of, an outright transfer of ownership." *Guzman v. Pichirilo,* 369 U.S. 698, 700, 82 S. Ct. 1095, 8 L. Ed. 2d 205 (1962); *see also Gaspard v. Diamond M. Drilling Co.,* 593 F.2d 605, 606 (5th Cir. 1979) ("[a] complete transfer of possession, command, and navigation of the vessel from the owner to the charterer is required in order to constitute a demise charter"); Schoenbaum, *Admiralty and Maritime Law,* § 11.1 (2d ed. 1994) ("a demise is present where the provisions of the charter show that those in charge of the vessel are intended to be the agents and servants of the demisee, not the shipowner"); 14 A.L.R. Fed. 544 ("of greatest significance in determining whether a charter party is one of … demise are the provisions, if any relating to the master and crew").

Here, the parties evidenced their intent to create a bareboat charter by titling the Agreement, "Recreational Bareboat Charter Agreement." More importantly, Plaintiff as charterer "shall accept full possession, command, and navigation of the vessel" and ultimately remained "responsible for the operation and management of the vessel." Plaintiff was also charged with the obligation to furnish and pay for its own crew, as well as be responsible for all expenses and operating costs of the vessel during the charter period.

Contrary to Plaintiff's allegations, Utopia did not retain any right or exercise of control over the vessel or its crew so as to alter the character of the agreement as a bareboat charter. Even if some oversight remained with Utopia, the relevance of which is expressly disputed, this does not alter the analysis. *See e.g. Stolthaven Houston, Inc. v. Rachel B.*, 2008 U.S. Dist. LEXIS 55723, 2008 WL 2854278 *5 (S.D. N.Y. July 18, 2008) ("a registered owner properly may retain some modicum of oversight of the vessel in a bareboat charter [ ], since a bareboat charter is, after all, a lease and not a complete transfer

10

of title"); *Diaz v. The Seathunder*, 191 F.Supp. 807, 817 (D.C. Md. 1961) (confirming status of bareboat charter where the charterer was responsible to maintain the vessel in a good state of repair, dry dock the vessel, allow the owner the right to inspect the vessel, and maintain insurance on the vessel).

Plaintiff's Complaint is rife with allegations that are plainly contradicted by the terms and conditions of the Bareboat Charter, including but not in any way limited to: "[a]t all times material hereto Owner owned, operated, managed, maintained and/or controlled the Vessel." [D.E. 1 at ¶ 11]; "[f]rom at least August 8, 2021 until August 11, 2021, Plaintiff Conway was a passenger of the Vessel owned and operated by Owner, which was in navigable waters." [D.E. 1 at ¶ 12]; "[d]espite the Charter Agreement, the Owner retained complete and exclusive control of the Vessel during the Scheduled Trip, including when Plaintiff Conway was injured." [D.E. 1 at ¶ 16]; "[a]t all material times, the Vessel was owned, managed, operated and/or controlled by Owner." [D.E. 1 at ¶43].

These inconsistences were not readily apparent to the Court upon its review of the Complaint because the Bareboat Charter was not provided, though it should have been.[5] Supplemental Rule E does not restrict a court's review to the adequacy of the allegations in the complaint, however. Under Rule E(4)(f), a court may consider any allegations or evidence offered in the parties' papers or at the post-attachment hearing. *Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navegacion, C.A.*, 169 F. Supp. 2d 1341, 1357-58 (M.D. Fla. 2001). Along the same lines, it is the law in this Circuit that "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Industries, Inc. v. Irvin,* 496 F.3d 1189, 1206 (11th Cir. 2007); *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009).

---

[5] *See Adamson v. Poorter*, 2007 U.S. App. LEXIS 23577, 2007 WL 2900576, at *3 (11th Cir. 2007) ("…when a plaintiff files a complaint based on a document but fails to attach that document to the complaint, the defendant may so attach the document, and therefore, the document, as one that could have or rather in fairness should have been attached to the complaint, is considered part of the pleadings.").

11

If Plaintiff had presented the Court with the bareboat charter agreement, and the Court was given the opportunity to view and interpret the agreement for itself, instead of relying on the conclusory allegations of the Complaint, the Court could have determined the true nature of the relationship between the parties. The omission of this critical operative document spoiled the Court's probable cause analysis undertaken at the time the vessel arrest warrant was presented. Now, in the spirit of due process underlying the purpose of Supplemental Rule E(f)(4), the Court should review the Bareboat Charter for itself and consider the impact it has upon the allegations in the Complaint. *See S & S Diesel Marine Servs. V. M/V F-Troop*, 2011 U.S. Dist. LEXIS 53808, 2011 WL 1899402, at *8 (S.D. Fla. May 18, 2011)("The purpose of such a post-arrest hearing is to afford due process to the vessel's owner.").

At bottom, a simple review of the terms of the bareboat charter agreement demonstrates it is a demise charter.

### ii.     At the time of his alleged injury, Plaintiff was an owner pro hac vice.

An owner *pro hac vice* of a vessel is "one who 'stands in the place of the owner for the voyage or service contemplated and bears the owner's responsibilities, even though the latter remains the legal owner of the vessel.'" *Matute v. Lloyd Berm. Lines, Ltd.*, 931 F.2d 231, 235 n.2 (3d Cir.) (quoting *Aird v. Weyerhaeuser S.S. Co.*, 169 F.2d 606, 610 (3d Cir. 1948), cert. denied, 337 U.S. 959 (1949)), cert. denied, 502 U.S. 919 (1991). In effect, for liability purposes, an owner *pro hac vice* is treated as a shipowner. *See Reed v. The Yaka*, 373 U.S. 410, 412-13, 83 S. Ct. 1349 (1963); *see generally* Gilmore & Black, The Law of Admiralty § 4-23, at 242.

Under a bareboat or demise charter, the charterer is considered the owner of the vessel *pro hac vice* and all *in personam* liability arising out of the vessel's operation during the demise is considered the charterer's rather than the owner's. *Marr Enters, Inc. v. Lewis Refrigeration Co.,* 556 F.2d 951, 957 (9th

Cir. 1977); *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993) ("the bareboat charterer as a demise charterer is the owner *pro hac vice* of the vessel for the duration of the contract… [and] is therefore responsible *in personam* for the negligence of the crew and the unseaworthiness of the vessel").

As set forth above, Plaintiff and Utopia entered into a bareboat charter agreement. Plaintiff, as the charterer, was the owner *pro hac vice* for the subject voyage and was charged with the responsibilities of the shipowner at the time of his injury.

### iii.     Plaintiff does not have a valid maritime lien and the arrest should be vacated.

Plaintiff was the owner *pro hac vice* of the vessel during the subject voyage and could not hold a valid maritime lien against the vessel under binding general maritime law given this status. The "stranger to the vessel" doctrine dictates that owners of a vessel, <u>or those that have authority over a vessel such that they are in a similar position to owners</u>, are denied maritime liens. *See Sasportes v. M/V Sol De Copacabana*, 581 F.2d 1204, 1208-09 (5th Cir. 1978) (emphasis supplied).[6] *See also Medina v. Marvirazon Compania Naviera, S.A.*, 709 F.2d 124, 125 (1st Cir. 1983) (per curium) (recognizing that those who hold authority over the vessel are not legally entitled to hold maritime liens thereon).

While typically applied in a joint-venture context, the plain wording of *Sasportes* contemplates that maritime liens are not only denied to joint-venturers but also owners and "those that have authority over a vessel such that they are in a similar position to owners." Plaintiff, as an owner *pro hac vice* did, in fact, have authority, possession, and command over the vessel as a result of the bareboat charter, and therefore his alleged maritime tort lien never came into existence.

---

[6] The Eleventh has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206. 1209 (11th Cir. 1981) *(en banc)*.

13

Of course, a charterer like Plaintiff "may [] have an *in personam* contract claim against the true owner. [7] But when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself." *Sasportes*, at 1208-09; *see also Admiral Cruise Servs. V. M/V St. Tropez*, 2006 U.S. Dist. LEXIS 110057, at *14 (S.D. Fla. Mar. 30, 2006)(J. Jordan) ("I also agree that if Florida Entertainment was the vessel's owner *pro hac vice* it could not assert a maritime lien against the vessel for service it provided, since it would not have been a "stranger to the vessel."); *Medina v. Maryirazon Compania Naviera S.A.*, 709 F.2d 124, 125 (1st Cir. 1983) ("Owners are denied liens as it is inequitable for those who are primarily liable for a debt to be reimbursed to the detriment of other lienholders out of the vessel's proceeds. . . . <u>[O]thers are denied liens when they have considerable authority over the vessel such that they are in a similar position to the owner and there would be insuperable legal difficulties in the enforcement of [the lien], or because-on the grounds similar to estoppel-to recognize it would be inequitable to other claimants.</u>") (emphasis supplied); *L & L Elecs., Inc. v. M/V Osprey*, 764 F. Supp. 2d 270, 272-73 (D. Mass. 2011)("The 'stranger to the vessel' doctrine, accordingly, exists to exclude owners from the protection of maritime liens.").

*Sasportes'* rationale recognizes that parties such as owners or those in a similar position as owners who are not "strangers" to the vessel cannot hold a maritime lien against the vessel for equitable reasons. 581 F.2d 1204, 1207 (5th Cir. 1978). This is exactly the case here – Plaintiff as the owner *pro hac vice* of the vessel was precluded from having a maritime lien on the very vessel for which he was, by contract, responsible for at the time of his injury.

---

[7] Plaintiff's only claim sounds in negligence, and Plaintiff's *in rem* Complaint did not bring a claim for breach of the charter party agreement against Utopia.

Accordingly, Plaintiff's status as an owner *pro hac vice* legally negated the existence of his maritime lien against the vessel. The requirements of Supplemental Rule C were therefore not satisfied, the arrest warrant was improperly issued, and it should be vacated immediately.

### iv. Utopia is entitled to award of fees and costs under the circumstances.

Under Local Rule C(7), if the Court vacates the arrest of the Vessel, "the court shall award attorney's fees, costs, and other expenses incurred by any party as a result of the arrest." The Court should vacate arrest of the Vessel and further award Utopia all fees and costs incurred as a result of the improper arrest pursuant to Local Rule C(7) and for Plaintiff's abuse of Supplemental Rule C, which constitutes bad faith and similarly gives rise to an award of attorneys fees under general maritime law as well.

WHEREFORE, Owner, Utopia Yachting LLC., respectfully requests this Honorable Court: 1) enter an Order to Show Cause requiring Plaintiff demonstrate why the instant arrest should not be vacated; 2) require Plaintiff provide an expedited response; 3) set a prompt show cause hearing, if necessary, so that the rights of the parties can be determined; 4) enter an order vacating the arrest of the Vessel; 5) reserve jurisdiction to award Utopia its attorney's fees and costs for wrongful arrest; and, 6) for such other relief as the Court deems just and appropriate under the circumstance.

Respectfully submitted,

*/s/ Marcus G. Mahfood*
Marcus G. Mahfood [FBN: 41495]
**THE CHARTWELL LAW OFFICES, LLP**
100 SE 2nd Street, Suite 2150
Miami, FL 33131
Telephone (305) 372-9044
Fascimile (305) 372-5044
mmahfood@chartwelllaw.com

~AND~

>JEFFREY A. NEIMAN
>**MARCUS NEIMAN**
>**RASHBAUM & PINEIRO, LLP**
>2 S. Biscayne Boulevard, Suite 2530
>Miami, Florida 33131
>Telephone (954) 462-1200
>Fascimile (954) 688-2492
>jneiman@mnrlawfirm.com
>
>**ATTORNEYS FOR OWNER AND VESSEL**

### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument is being served upon counsel for Plaintiff, in accordance with the Federal Rules of Civil Procedure, on this 7th day of December, 2021, as follows:

**_Attorneys for Plaintiff_**
CURTIS J. MASE
Florida Bar No.: 478083
cmase@maselaw.com
TYLER J. RAUH
Florida Bar No.: 1023404
trauh@maselaw.com
MASE MEBANE SEITZ, P.A
2601 South Bayshore Drive, Suite 800
Miami, Florida 33133
Telephone: (305) 377-3770
Facsimile: (305) 377-0080

*Attorneys for Plaintiff Pending Pro Hac Vice Admission:*
RONALD A. MCINTIRE
California Bar No. 127407
RMcIntire@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E, Suite 1700
Los Angeles, California 90067
Telephone: 310.788.9900
Facsimile: 310.788.3399

CHRISTOPHER G. SIGMUND
Texas Bar No. 24122835
CSigmund@perkinscoie.com
PERKINS COIE LLP
500 N. Akard Street, Suite 3300
Dallas, Texas 75201
Telephone: 214.965.7700
Facsimile: 214.965.7799

MICHAEL A. BARCOTT
Washington State Bar No. 13317
mbarcott@hwb-law.com
HOLMES WEDDLE & BARCOTT
3101 Western Avenue, Suite 500
Seattle, Washington 98121
Telephone: 206.292.8008
Facsimile: 206.340.0289

          */s/ Marcus G. Mahfood*
          Marcus G. Mahfood